UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X
                                                                   :
C.G., by his mother and natural guardian,                          :      12-CV-1606 (ARR)(VVP)
MINERVA GONZALEZ,                                                  :
                                                                   :      NOT FOR ELECTRONIC
              Plaintiff,                                            :      OR PRINT PUBLICATION
                                                                   :
     -against-                                                     :      OPINION & ORDER
                                                                   :
CITY OF NEW YORK, POLICE DEPARTMENT                                :
OF THE CITY OF NEW YORK, POLICE OFFICER                            :
WERNERSBACH (first name unknown), and POLICE                       :
OFFICER ORTIZ (first name unknown),                                :
                                                                   :
              Defendants.                                          :
                                                                   :
----------------------------------------------------------------- X

ROSS, United States District Judge:

     Plaintiff, C.G., by his mother and natural guardian Minerva Gonzalez, brings this action

pursuant to 42 U.S.C. § 1983 against defendants City of New York, Police Department of the

City of New York, and Police Officers Wernersbach and Ortiz of the New York City Police

Department ("NYPD").[1] He seeks to hold defendants liable for violations of his constitutional

rights during an incident taking place near the intersection of Avenue M and East 17th Street in

Brooklyn on September 16, 2011. Now before the court is defendants' motion for summary

judgment. For the reasons set forth below, defendants' motion for summary judgment is granted

in part and denied in part.

## I. BACKGROUND

     The following facts are drawn primarily from the parties' respective statements pursuant

to Local Rule 56.1 and the deposition testimony of the plaintiff and defendants Wernersbach and

Ortiz. See Dep. of C.G., Jan. 17, 2013 ("Pl. Dep."), annexed as Ex. B to the Decl. of Felicia A.

---

[1] Defendant Police Officer Wernersbach is Police Officer Joseph Wernersbach (now Sergeant), Shield No. 6303.
Defendant Police Officer Ortiz is Police Officer Jerry Ortiz, Shield No. 17201. Def. Mem. of Law 1.

Yancey, May 29, 2013 ("Yancey May 29 Decl."), Ex. B to the Decl. of Robert J. Tolchin

("Tolchin Decl."), June 17, 2013, and Ex. K to the Decl. of Felicia A. Yancey, July 3, 2013

("Yancey July 3 Decl."); Dep. of Sergeant Joseph Wernersbach, Jan. 30, 2013 ("Wernersbach

Dep."), annexed as Ex. F to Yancey May 29 Decl. and Ex. C to Tolchin Decl.; Dep. of Police

Officer Jerry Ortiz, Jan. 22, 2013 ("Ortiz Dep."), annexed as Ex. E to Yancey May 29 Decl. and

Ex. E to Tolchin Decl.[2] The facts are undisputed except where otherwise noted.

On the afternoon of September 16, 2011, plaintiff, then age 15, and his friend Yusef

Fergoug were near the corner of Avenue M and East 17th Street in Brooklyn, in front of a 7-

Eleven store. Pl. Dep. 35-36; N.Y.C. Omniform System Arrest Report for C.G., Sept. 16, 2011

("Police Report"), annexed as Ex. G to Yancey May 29 Decl. They were waiting for Fergoug's

girlfriend. Pl. Dep. 40. They were about a block away from Edward R. Murrow High School, and

many high school students were congregating in the area. Id. NYPD officers in uniform came to

the area and told the students to disperse. Id. at 41.

What transpired next is the subject of considerable dispute. Plaintiff stated that he and

Fergoug were "basically leaving" and "walking away slowly" when defendant officer

Wernersbach came over, moved them to the edge of the sidewalk, and asked them for

identification. Id. at 42-43. Plaintiff stated that he gave Wernersbach his school identification. Id.

at 43-44. Since he was "nervous," he spit "to the side of the floor" or "to the side of the street."

Id. at 45-46. According to plaintiff, Wernersbach then told him he was under arrest, grabbed his

hand, and pulled it to the side. Id. at 47. Plaintiff stated that he asked Wernersbach why he was

under arrest, then "in a split second" defendant officer Ortiz "came out of nowhere and tackled

---

[2] The parties each submitted various portions of the depositions as exhibits to the Defendants' Statement of Facts Pursuant to Local Rule 56.1, Plaintiff's Counterstatement Pursuant to Local Rule 56.1, and Defendants' Reply to Plaintiffs' Counterstatement Pursuant to Local Rule 56.1.The court will refer to specific parts of the depositions in the record using the deponent's name and page number, rather than specifying which particular exhibit includes that portion.

[plaintiff] to the ground." Id. at 49. He stated that Ortiz grabbed and "bear hugged" him and pushed him to the ground with Ortiz on top of him. Id. at 53-54. While they were on the ground, Ortiz punched plaintiff "about five to eight times" with a closed fist on the forehead and by his left eye. Id. at 54. According to plaintiff, he held his two closed fists on both sides of his head to try to protect himself. Id. Ortiz then flipped plaintiff "to the side with force," pulled his arms up, put handcuffs on him, and brought him to the curb. Id. at 59. Plaintiff stated that he felt "terrible pain" in his shoulder. Id. Ortiz tied plaintiff's book bag to his handcuffs while the handcuffs were around plaintiff's wrists. Id. at 67-68.

The defendant police officers provide a very different account of the interaction. Wernersbach stated that on the afternoon of September 16, he and Ortiz parked and got out of their police car because they saw a group of about 80 students gathering in front of the 7-Eleven. Wernersbach Dep. 55. The two officers separated, and Wernersbach walked up to the group and told them to disperse because the large crowd created a "hazard condition." Id. at 65-66, 69. He stated that the majority of students complied with the order. Id. at 67. He then approached plaintiff and Fergoug and requested that they also disperse with the rest of the group, because they were the only two individuals who had failed to comply with his order. Id. at 68-69. He ordered them to disperse about five or six times, but they were "verbally combative" with him, cursed at him, and refused to comply. Id. at 71, 73. Because they had failed to comply with the order to disperse, Wernersbach requested that they both provide identification. Id. at 73. He stated that Fergoug provided identification, but plaintiff refused to provide identification and continued to curse at him and "cause a scene." Id. at 78-80. After Wernersbach asked plaintiff approximately four more times to provide identification, and plaintiff repeatedly refused, Wernersbach told plaintiff that if he would not provide identification, Wernersbach "would not

have a choice" and would have to bring him to the precinct. Id. at 80. When plaintiff still refused to provide identification, Wernersbach informed him that he was under arrest and asked plaintiff to give him his hands. Id. at 81. He reached for plaintiff's right hand and tried to place a handcuff over his right wrist. Id. at 83. Plaintiff was wearing a bulky sweatshirt or jacket, so the handcuff did not click closed over his wrist. Id. at 84. Plaintiff then raised his right arm above his head "in an effort to avoid being handcuffed" and took a "squared stance" toward Wernersbach, raising his two closed fists to his chest "similar to a boxer." Id. at 84-85.

Ortiz, who had been nearby dispersing other students, stated that he "heard a crowd yelling" in a manner that suggested a "possible altercation around the corner" and came over to see what was happening. Ortiz Dep. 106, 114. He saw Wernersbach trying to put a handcuff on plaintiff while plaintiff was pulling his arms back. Id. at 120. Ortiz came over to try to grab plaintiff by the arm, then plaintiff "broke free," turned around, and faced Ortiz with his hands up in a "combative stance." Id. at 125, 129-131. Ortiz told plaintiff he was being placed under arrest, then tried to grab him, when plaintiff "proceeded to throw a punch" at Ortiz. Id. at 132. Ortiz ducked, and plaintiff "skimmed the top of [Ortiz's] head." Id. at 133. As Ortiz tried to grab plaintiff's hands to handcuff him, they fell on the ground with Ortiz on top and plaintiff's back to the ground facing him. Id. at 136. While the two of them were on the ground, plaintiff punched Ortiz in the forehead, causing redness "like a bruise." Id. at 137. Ortiz stated that he "had to use the levels of force" to restrain plaintiff, and that he struck plaintiff with his fist on plaintiff's forehead. Id. at 139. Plaintiff continued to resist and try to throw punches, and Ortiz eventually rolled him over, handcuffed him, stood him up, and took him to the corner. Id. at 140-42.

It is undisputed that that the officers also arrested Fergoug, that they put both plaintiff and Fergoug in a police vehicle, and that they took them to the 70th Precinct. Pl. Dep. 61, 69.

Wernersbach, the arresting officer, arrested plaintiff on charges of obstructing governmental administration, resisting arrest, unlawful assembly, disorderly conduct, and loitering on school grounds. Police Report 1-2. Plaintiff's mother came to the precinct. Pl. Dep. 75. The NYPD gave plaintiff's mother a notice for plaintiff to appear in Family Court on September 20, 2011. Yancey May 29 Decl., Ex. I. The NYPD offered medical aid due to plaintiff's "bruising and swelling to the face," but plaintiff's mother declined. Yancey May 29 Decl., Ex. H. Instead, plaintiff's mother chose to take plaintiff to Maimonides Medical Center because it is closer to their home. Dep. of Minerva Gonzalez ("Gonzalez Dep."), annexed as Ex. C to Yancey May 29 Decl., Ex. D to Tolchin Decl., and Ex. L to Yancey July 3 Decl., 10-11. Plaintiff and his parents went to Maimonides Medical Center just after midnight the following morning, reporting pain in the left shoulder, wrist, and face and dizziness. Yancey May 29 Decl., Ex. J. The examination found a left frontal scalp hematoma and soft tissue swelling in the left face. Id. at 4. Staff at the medical center prescribed ibuprofen and discharged plaintiff. Id.

Plaintiff went with his parents to Family Court on two separate occasions, and on the second court date, the charges were dismissed. Gonzalez Dep. 11-13.  Plaintiff filed the instant complaint on April 2, 2012. Dkt. #1.

## II. DISCUSSION

Plaintiff asserts § 1983 claims for false arrest and excessive force and a municipal liability claim against defendants City of New York and the Police Department. Compl. ¶¶ 20, 22-23.[3] Defendants have moved for summary judgment on the grounds that: (1) the New York City Police Department is not a suable entity; (2) plaintiff's false arrest claim should fail because

---

[3] Plaintiff does not appear to raise any state law claims in the complaint. Defendants' motion for summary judgment argues that, to the extent state claims are alleged, they should be dismissed for failure to comply with New York State notice of claim requirements. Def. Mem. of Law 24. Plaintiff states that no state law claims are alleged. Pl. Mem. of Law 23. Therefore, there are no state law claims for the court to address.

the NYPD officers had probable cause to arrest plaintiff; (4) plaintiff's excessive force claim should fail because the amount of force used by the defendant officers was reasonably necessary to effectuate plaintiff's arrest; (3) defendant officers Wernersbach and Ortiz are entitled to qualified immunity; and (4) plaintiff's municipal liability claims should fail because plaintiff does not identify a municipal policy, practice, or custom that resulted in a violation of his constitutional rights.

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)) (internal quotation marks and ellipses omitted).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving

party's case." <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994).

Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party

"must come forward with specific facts showing that there is a genuine issue for trial." <u>LaBounty</u>

<u>v. Coughlin</u>, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is

required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought." <u>McLee v. Chrysler Corp.</u>, 109 F.3d 130, 134

(2d Cir. 1997).

### B. Plaintiff's False Arrest Claim

In order to make out a claim under 42 U.S.C. § 1983, plaintiff must allege (1) that the

challenged conduct was "committed by a person acting under color of state law," and (2) that

such conduct "deprived [the plaintiff] of rights, privileges or immunities secured by the

Constitution or the laws of the United States." <u>Cornejo v. Bell</u>, 592 F.3d 121, 127 (2d Cir. 2010)

(quoting <u>Pitchell v. Callan</u>, 13 F.3d 545, 547 (2d Cir. 1994)).

A § 1983 claim for false arrest, asserting a deprivation of the Fourth Amendment right to

be free from unreasonable seizures, is "substantially the same" as a claim for false arrest under

New York state law. <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d. Cir. 1996). The plaintiff must prove

that the defendant intentionally confined plaintiff, that plaintiff was conscious of the confinement

and did not consent to it, and that the confinement was not otherwise privileged. <u>See</u> <u>Jocks v.</u>

<u>Tavernier</u>, 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting <u>Broughton v. State</u>, 335 N.E.2d 310,

314 (N.Y. 1975)); <u>Harris v. Cnty. of Nassau</u>, 581 F. Supp. 2d 351, 354-55 (E.D.N.Y. 2008). If

officers had probable cause to arrest plaintiff, then the confinement is privileged. <u>Jocks</u>, 316 F.3d

at 135. Therefore, the existence of probable cause constitutes a complete defense to a § 1983

false arrest claim. Covington v. City of N.Y., 171 F.3d 117, 122 (2d Cir. 1999) (quoting Weyant, 101 F.3d at 852).

Probable cause to arrest exists when the officer has "knowledge or reasonably trustworthy information . . . sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant, 101 F.3d at 852. Evaluating whether probable cause exists is an objective inquiry, and the arresting officer's state of mind is irrelevant. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (citing Whren v. United States, 517 U.S. 806, 812-13 (1996)). As long as the officer had probable cause to arrest for some crime, "it is not relevant whether probable cause to arrest existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006); see also Devenpeck, 543 U.S. at 153.

On a motion for summary judgment, the court can determine probable cause as a matter of law if the relevant events and knowledge of the officer are not in dispute. See Drummond v. Castro, 522 F. Supp. 2d 667, 673 (S.D.N.Y. 2007); Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). Even if facts are disputed, a defendant may still be entitled to summary judgment on a § 1983 claim for false arrest if the plaintiff's version of events establishes the existence of probable cause to arrest. Mistretta, 5 F. Supp. 2d at 133. However, "[w]here the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events," the issue of which account of the events to credit and whether the officer had probable cause is to be decided by the jury. Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997); see also Barksdale v. Colavita, 506 F. App'x 82, 85 (2d. Cir 2012); Zhao v. City of N.Y., 656 F. Supp. 2d 375, 387 (S.D.N.Y. 2009).

Defendants argue that plaintiff's §1983 claim for false arrest must fail as a matter of law because defendants had probable cause to arrest plaintiff for disorderly conduct. Under the relevant New York statute, a person is guilty of disorderly conduct if, acting "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," he congregates with others in a public place and refuses to comply with a lawful order by the police to disperse. N.Y. Penal Law § 240.20(6).

Drawing all inferences in favor of plaintiff, as the court must do at this stage, the court cannot find as a matter of law that defendant officers had probable cause to arrest plaintiff for disorderly conduct. Instead, the record shows that one of the essential elements of the offense is disputed: whether or not plaintiff complied with Wernersbach's order to disperse. Plaintiff stated that after Wernersbach ordered the crowd to disperse, he and Fergoug were "slowly moving away." Pl. Dep. 41-42. Fergoug also stated that he and plaintiff were "walking" and "moving" when Wernersbach stopped them. Dep. of Yusef Fergoug, January 17, 2013 ("Fergoug Dep."), annexed as Ex. D to Yancey May 29 Decl. and Ex. A to Tolchin Decl., 33, 60-61. By contrast, Wernersbach stated that plaintiff and Fergoug were the only two individuals in the crowd who refused to disperse. Wernersbach Dep. 69. Furthermore, while there is no dispute that Wernersbach stopped plaintiff and Fergoug and asked them for identification, the events that happened next are disputed. Both plaintiff and Fergoug stated that they both showed their identification to Wernersbach. Pl. Dep. 43; Fergoug Dep. 33, 60. Yet Wernersbach stated that he asked plaintiff approximately five times to provide identification, but plaintiff refused. Wernersbach Dep. 78-81.

Defendants argue that there is no genuine factual dispute because plaintiff's testimony is equivocal; he stated they were "basically leaving" and "walking away slowly" as they waited for

Fergoug's girlfriend. Pl. Dep. 41-42. Therefore, defendants argue, it would be reasonable for an officer at the scene to believe two students walking away slowly and remaining on the same corner were not complying with the order to disperse.  Def. Reply Mem. 8-9. The court disagrees. If a jury chose to credit plaintiff and Fergoug's version of events, the jury could reasonably conclude that they were attempting to comply with the order and walk away, albeit slowly, until Wernersbach stopped them. Because the record reflects a genuine dispute over the material facts of whether plaintiff complied with Wernersbach's orders to disperse and to provide identification, defendants cannot establish as a matter of law that the officers had probable cause to arrest plaintiff for disorderly conduct.[4]

Defendants argue in the alternative that the officers had probable cause to arrest plaintiff for a violation of a New York City Health Code provision that prohibits spitting "upon a sidewalk of a street or place, or on a floor, wall, or stairway of any public or private building or premises used in common by the public . . . ." 24 N.Y.C. Rules & Regs. § 181.03(a). Plaintiff did state that he spat in the presence of Wernersbach. Pl. Dep. 45. However, the record does not establish that plaintiff violated the cited Health Code provision, since it is unclear where plaintiff spat. Plaintiff stated that he spat "to the side of the floor," id. at 45, but since he was outside when the incident occurred, this does not show that he violated the ban on spitting on a "floor . . . of a public or private building." Plaintiff then amended his description to state that he spat to "the

---

[4] Plaintiff argues that, even assuming Wernersbach's account was the only version of the events, the facts would not support probable cause to arrest plaintiff for disorderly conduct. New York courts have held that the element of "congregating with others" requires a crowd of at least three people. People v. Carcel, 144 N.E.2d 81, 85 (N.Y. 1957). Plaintiff argues that since Wernersbach stated that plaintiff and Fergoug were the only two people who failed to comply with the order to disperse, Wernersbach Dep. 69, plaintiff was not part of a group of at least three people. Pl. Mem. of Law 13. It should first be noted that the record does not show that plaintiff and Fergoug were the only people remaining in the area. Wernersbach stated that the rest of the crowd was starting to walk away, not that they had already left. Wernersbach Dep. 70-72. Fergoug stated that some members of the crowd were leaving and others were staying. Fergoug Dep. 32. Regardless, the court does not find this argument persuasive because there is no dispute that more than three people were congregating when Wernersbach initially ordered the crowd to disperse. See U.S. v. Nelson, 500 F. App'x 90, 92 (2d Cir. 2012).

side of the street," id. at 45-46, and Fergoug stated that plaintiff "turn[ed] to the street" and spat. Fergoug Dep. 33-34. Defendants argue that "to the side of the street" refers to the sidewalk. Def. Reply Mem. 3. Yet "to the side of the street" could just as easily refer to the part of the street that is next to the sidewalk. Drawing all reasonable inferences in favor of plaintiff, the court finds that the testimony of plaintiff and Fergoug could refer to plaintiff spitting on the street, not the sidewalk. Therefore, the court cannot find as a matter of law that defendants had probable cause to arrest plaintiff for violating the ban on spitting on the sidewalk.[5]

Finally, defendants argue that Wernersbach had probable cause to arrest plaintiff for obstructing governmental administration. A person is guilty of this offense if he "prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . ." N.Y. Penal Law § 195.05.  Refusing to obey orders to leave the premises can be the basis for an arrest for obstructing governmental administration. See, e.g., Berger v. Schmitt, 91 F. App'x 189, 191 (2d Cir. 2004). However, for the reasons stated above, the court finds that a factual dispute exists as to whether or not plaintiff complied with Wernersbach's orders to disperse and to show his identification. Defendants cannot rely on this offense to establish probable cause as a matter of law.

---

[5] Plaintiff argues that, even assuming arguendo that plaintiff spat on the sidewalk, this action could not serve as a basis for probable cause to arrest him, because a Health Code violation is not a criminal offense. Pl. Mem. of Law 15-16. This argument is unavailing. The Supreme Court has established that a custodial arrest is constitutional if an officer has probable cause to believe the individual committed "even a very minor criminal offense in his presence," such as a misdemeanor seatbelt violation punishable only by a fine. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001). In this case, offenses under the relevant Health Code provision are punishable under New York City Criminal Courts Act Section 102(c) by a fine of not more than $25 or by imprisonment up to 10 days or both. This court has previously denied a false arrest claim under § 1983 when the individual committed a violation of the New York City Transit Authority's Rules of Conduct punishable by the same amount of fine or length of imprisonment. Richardson v. Providence, 09-CV-4647 (ARR) (LB), 2011 U.S. Dist. LEXIS 94246 (E.D.N.Y. 2011), at *9. Similarly, this court has denied a § 1983 claim where the plaintiff admitted to the Health Code violation of littering. Sands v. City of New York, CV-04-5275 (BMC) (CLP), 2006 U.S. Dist. LEXIS 72111 (E.D.N.Y. Oct. 3, 2006), at *15 ("New York law…explicitly makes violation of the Health Code a misdemeanor, and provides for warrantless arrest when an officer has probable cause to believe any offense has been committed in his presence."). Therefore, a violation of the Health Code prohibition on spitting could establish probable cause to arrest and defeat a false arrest claim under § 1983. However, for the reasons set forth above, defendants are not entitled to summary judgment on this issue because there is a material factual dispute regarding whether plaintiff violated the Health Code provision.

Because material facts surrounding plaintiff's arrest are disputed, defendants cannot establish as a matter of law that the officers had probable cause to arrest him. Therefore, defendants are not entitled to summary judgment on plaintiff's false arrest claim.

**C. Plaintiff's Excessive Force Claim**

The Fourth Amendment prohibits officers from using an unreasonable degree of force to carry out an arrest. Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010); see also Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003) (plaintiff can prevail on an excessive force claim if he shows the officer used "more force than was necessary to subdue him."). In assessing § 1983 claims for excessive force, courts must apply an objective test, judging the use of force "from the perspective of a reasonable officer on the scene," and with the understanding that officers have to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97; see also Tracy, 623 F.3d at 96.

Determining whether the officer's use of force was reasonable is a fact-intensive inquiry in which the court should consider the nature of the crime, whether the suspect was a threat to the safety of the officers or to others, and whether the suspect was attempting to resist or evade arrest. Graham, 490 U.S. at 396. Therefore, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004); see also Sullivan v. Gagnier, 225 F.3d 161, 165 (2d Cir. 2000) (excessive force claim "requires consideration of the specific facts in each case").

Defendants argue that Ortiz's actions were reasonable and that he used the degree of force necessary to subdue and handcuff plaintiff. However, while there is no dispute that Ortiz

used force, the record reflects a clear dispute over the circumstances in which he used it. Under

defendants' account, while Wernersbach was attempting to handcuff plaintiff, plaintiff broke

free, placed his hands up in a boxing stance, and swung at Ortiz. Ortiz Dep. 120-132. According

to Ortiz, after he grabbed plaintiff and they fell to the ground, plaintiff punched Ortiz in the

forehead, and only then did Ortiz decide to use force to restrain plaintiff. Id. at 137-39.

Defendants argue that this account is not actually disputed, since neither plaintiff nor any other

witnesses ever specifically denied that plaintiff swung at, punched, or struck Ortiz. Def. Reply

Mem. 5.[6] Yet viewed in the light most favorable to plaintiff, the record shows that plaintiff and

Fergoug's accounts cannot be reconciled with Ortiz's version of the events. First, both of them

state that Ortiz arrived on the scene and immediately tackled plaintiff, leaving no opportunity for

plaintiff to place his hands in a boxing stance or swing at Ortiz. Plaintiff stated that Ortiz came

"in a split second," and "ran over and tackled [plaintiff]…without even asking questions." Pl.

Dep. 49-50. Fergoug stated that Ortiz came around the corner "so quick…like superman," that

Ortiz was "flying at [plaintiff] with open arms," and that "in a split second" plaintiff and Ortiz

were on the ground. Fergoug Dep. 35-36. Both plaintiff and Fergoug also state that once Ortiz

and plaintiff fell to the ground, Ortiz started punching him immediately. Fergoug stated that after

they hit the ground, Ortiz began "pummeling [plaintiff's] face." Id. at 38. Plaintiff stated that

---

[6] Defendants argue that in some instances plaintiff failed to comply with Local Rule 56.1, which states that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  Moreover, "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civ. R. 56.1(c). It is unclear whether some parts of Plaintiff's Rule 56.1 counterstatement provide citations to the record that specifically deny defendants' statements. See, e.g., ¶¶ 60-65. Regardless, a district court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and may review the record to determine whether proposed undisputed facts were disputed.  Holtz v.Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001); see also Rateau v. City of N.Y., No. 06–CV–4751 (KAM)(CLP), 2009 U.S. Dist. LEXIS 90112, at *2 (E.D.N.Y. Sept. 29, 2009).

Ortiz "pumped me to the ground and started punching me," and he held his fists up next to his head to protect himself. Pl. Dep. 53-54. Both of these accounts contradict Ortiz's statement that once they were on the ground, plaintiff struck Ortiz first and Ortiz only struck in response.[7] These disputed facts are clearly material to whether Ortiz's use of force was reasonable. <u>Graham</u> instructs us to consider whether plaintiff represented a threat to Ortiz and whether he was attempting to resist or evade arrest, and the disputed facts are critical to determining these factors.

Furthermore, the record demonstrates a dispute over the amount of force that Ortiz used. Ortiz stated that he struck plaintiff approximately twice in the forehead. Ortiz Dep. 148-49. Plaintiff said Ortiz struck him about five to eight times, though he did not remember the exact number. Pl. Dep. 54. Fergoug stated that Ortiz struck plaintiff more than ten times. Fergoug Dep. 39-40. Defendants argue that "the exact number of times [that Ortiz struck plaintiff] is immaterial to the issue of whether force was used." Def. Reply Mem. 5. Yet whether force was used is not the disputed issue. The disputed issue is whether the amount of force that Ortiz used was reasonable under the circumstances, so the number of times that he struck plaintiff is entirely relevant to that inquiry. There is also an issue of fact regarding the degree of force that Ortiz used after he handcuffed plaintiff. According to plaintiff, once the handcuffs were around his

---

[7] Defendants also argue that once plaintiff was taken to the precinct, he apologized for striking Ortiz, thereby constituting an admission that plaintiff struck Ortiz. Yet the record shows that the details of plaintiff's apology are disputed. Ortiz stated that when he saw plaintiff at the precinct, plaintiff initiated a conversation, apologized to him, and admitted he had to "show off" because there were girls watching. Ortiz Dep. 181-82. The record does not show that Ortiz recalled plaintiff specifically admit to striking him, just that he recalled plaintiff apologizing in general. <u>Id.</u> Wernersbach stated that at the precinct, before plaintiff's mother arrived, plaintiff apologized to him for "striking Officer Ortiz and…not listening to the police officers." Wernersbach Dep. 120. Plaintiff, for his part, stated only that he was "conversating" with Wernersbach before his mother arrived. Pl. Dep. 74. He stated that the next thing he remembered is Ortiz coming in with his mother. <u>Id.</u> at 74. His mother stated that she told plaintiff to apologize to the officers, and "he didn't want to do it," but he did. Gonzalez Dep. 11. Wernersbach stated that once plaintiff's mother arrived, he apologized for a second time, but only recalled him saying, "Officer, I'm sorry," without any specific reference to striking Ortiz. Wernersbach Dep. 120. Therefore, while there is no doubt that plaintiff at some point apologized to the officers, there are conflicting accounts about when plaintiff apologized, to whom he apologized, how many times he apologized, and the specific substance of what he said.

wrists, Ortiz tied plaintiff's book bag to the handcuffs, causing plaintiff "a lot of pain." Pl. Dep. 68. Defendants do not dispute that the officer tied the book bag to plaintiff's handcuffs but take issue with plaintiff's characterization of this action. Def. Reply Mem. 12. Therefore, there is an issue of fact regarding whether this use of force was reasonable under the circumstances.

Given the fact-intensive nature of the excessive force inquiry, and the extent to which material facts regarding Ortiz's use of force are in dispute, the court cannot conclude as a matter of law that Ortiz's use of force was reasonable. Defendants are not entitled to summary judgment on plaintiff's excessive force claim.

### D. Qualified Immunity

As an alternative, defendants argue that they are entitled to summary judgment on plaintiff's false arrest and excessive force claims because Wernersbach and Ortiz had qualified immunity.  The doctrine of qualified immunity shields government officials from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity protects officials if "it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." Mandell v. Cnty. of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003). Therefore, a police officer is entitled to qualified immunity if "at least some reasonable officers in the defendant's position 'could have believed that [the challenged conduct] was within the bounds of appropriate police responses.'" Zalaski v. City of Hartford, 723 F.3d 382, 389 (2d Cir. 2013) (quoting Saucier v. Katz, 533 U.S. 194, 208 (2001)).

The right to be free from arrest without probable cause is clearly established, but officers must apply the probable cause standard to a wide range of factual contexts. See Benn v. Kissane,

510 F. App'x 34, 38 (2d. Cir 2013) ("In the context of probable-cause determinations, the applicable legal standard is clear, but there are limitless factual circumstances that officers must confront when applying that standard.") (internal quotation marks omitted). Therefore, even if defendant police officers lacked probable cause to carry out the arrest, they are entitled to qualified immunity on plaintiff's false arrest claim if their determination that they had probable cause was objectively reasonable. See Gonzalez, 728 F.3d at 157. An officer's probable cause determination is objectively reasonable if there was "arguable probable cause at the time of arrest—that is, if officers of reasonable competence could disagree on whether the probable cause test was met." Jenkins v. City of N.Y., 478 F.3d 76, 87 (2d Cir. 2007) (quoting Lennon v. Miller, 66 F.3d 416, 423-24 (2d. Cir. 1995)) (internal quotation marks omitted); see also Guerrero v. Scarazzini, 274 F. App'x 11, 13 (2d Cir. 2008).

Similarly, it is "well established that the use of excessive force in the course of an arrest is constitutionally prohibited." Mickle v. Morin, 297 F.3d 114, 122 (2d Cir. 2002). The doctrine of qualified immunity shields officers from liability if their actions fall within "the sometimes hazy border between excessive and acceptable force." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 206) (internal quotation marks omitted); see also Hartman v. Cnty. of Nassau, 350 F. App'x 477, 479 (2d Cir. 2009); Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003).

Qualified immunity is usually an issue for the court to determine as a matter of law, but summary judgment is not appropriate if material facts are disputed. See Curry, 316 F.3d at 334-35 ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain.") (quoting Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998)); McKelvie v. Cooper, 190 F.3d 58, 63 (2d Cir. 1999) ("Where, as here, there are

16

facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate."); Weyant, 101 F.3d at 858 (finding that the officers' version of events "is sharply disputed, and the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law"); Oliveira v. Mayer, 23 F.3d 642, 649-50 (2d Cir. 1994).

As previously discussed, significant facts are in dispute regarding the events of September 16, 2011, so the court finds that defendants are not entitled to summary judgment on the basis of qualified immunity. On the plaintiff's false arrest claim, the facts taken in the light most favorable to plaintiff do not establish that Wernersbach had arguable probable cause to arrest plaintiff. Based on plaintiff's version of events, he complied with Wernersbach's orders to disperse and to show his identification, leaving no basis for a reasonable officer to believe that he was committing a crime.  See Williams v. Wood, 375 F. App'x 98, 101 (2d Cir. 2010) (summary judgment on unlawful arrest claim not appropriate where facts construed in the light most favorable to plaintiff did not justify the arrest); Bradley v. Jusino, 374 F. App'x 144, 146-47 (2d Cir. 2010) (summary judgment on false arrest claim not appropriate where facts are disputed and plaintiff's version of facts does not support finding of probable cause or arguable probable cause). On the plaintiff's excessive force claim, material facts are disputed regarding the amount of force that Ortiz used and the circumstances under which he used it, so defendants are not entitled to summary judgment on qualified immunity grounds. See Mickle, 297 F.3d at 122 ("Where the circumstances are in dispute, and contrasting accounts…present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity.") (internal quotation marks omitted); Tracy, 623 F.3d at 98 (summary judgment on the grounds of qualified immunity for

excessive force claim not appropriate where material issues of fact were disputed regarding when the officer used pepper spray and from what distance). The factual disputes in this case bear directly upon whether it was objectively reasonable for Wernersbach and Ortiz to believe that they were following the law when they arrested plaintiff and used force against him, thereby foreclosing summary judgment on qualified immunity grounds.

**E. Municipal Liability**

Plaintiff also brings municipal liability claims under § 1983. The complaint names both the City of New York and the Police Department of the City of New York, but defendants argue that the claims against the NYPD should be dismissed because the NYPD is a non-suable entity. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Admin. Code & Charter Ch. 16 § 396. The NYPD is an agency of the City and is therefore not a proper party to this action. See, e.g., Howell v. City of N.Y., No. 11-CV-6302 (RRM)(RLM), 2013 WL 3013663 (E.D.N.Y. June 18, 2013), at *2. Plaintiff's claim against the NYPD is dismissed and the court will only consider the claim against the City of New York.

A local government may not be held liable under § 1983 for the constitutional violations of its employees under a general theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). The local government can only be held responsible if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. "To properly plead a Section 1983 claim against a municipality, [p]laintiff must allege three separate elements:  (1) an official policy or custom that (2) subjected [p]laintiff to (3) a denial of a constitutional right."

Ferrari v. Cnty. of Suffolk, 790 F. Supp. 2d 34, 45 (E.D.N.Y. 2011).  The plaintiff must establish a "causal connection between the actions of the municipality and the alleged constitutional violation." Amnesty Am., 361 F.3d at 125 (citing Monell, 436 U.S. at 691-92).

A single incident of unconstitutional action by government officials is generally insufficient to establish municipal liability. See Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."); Henderson v. Town of Greenwich, 317 F. App'x 46, 47 (2d Cir. 2009); Shirer v. City of N.Y., No. 11 CV 1832(RJD)(CLP), 2012 WL 5954254 (E.D.N.Y. Nov. 28, 2012), at *1. The plaintiff needs to show that the employees' acts "were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." Jones, 691 F.3d at 81; see also Porter v. City of N.Y., No. 03-cv-6463-ENV-LB, 2007 WL 1791149, at *7 (E.D.N.Y. June 19, 2007).

Plaintiff has failed to offer evidence of any official municipal policy or custom sufficient to impose liability on the City of New York. In his pleadings, plaintiff alleges that defendants' conduct was "consistent with the policies" of the City and NYPD. Compl. ¶ 22. The only stated basis for this allegation is that "plaintiff has never been informed of any disciplinary actions having been taken against the officers." Id.[8] This general assertion, supported only by a speculative claim, is "insufficiently particularized" to state a municipal liability claim against the city. Spears v. City of N.Y., No. 10-CV-03461, 2012 WL 4793541 (E.D.N.Y. Oct. 9, 2012), at

---

[8] Plaintiff's complaint also asserts a claim against the City based on vicarious liability. Compl. ¶ 23. This claim is not viable because, as discussed above, Monell clearly precludes municipal liability on the theory of respondeat superior. Monell, 436 U.S. at 690.

*11; see also Taylor v. Nassau Cnty., No. 11-CV-0934 (SJF)(GRB), 2012 WL 5472554

(E.D.N.Y. Nov. 5, 2012), at *10 (rejecting Monell claim based on police department's failure to

investigate incident and discipline officer because plaintiff failed to offer evidence that the

county had a custom or practice of not investigating uses of force by officers).

   Plaintiff's opposition brief raises a new argument for municipal liability based on the

NYPD's Safe Corridor Program. Pl. Mem. of Law 22-23. There is no dispute that Wernersbach

and Ortiz were assigned to the Safe Corridor Program, in which NYPD units patrol areas near

schools to monitor dismissals and disperse groups of students. Wernersbach Dep. 26.

Wernersbach stated that the number of officers in the unit had been reduced, "and they had us

tasked with managing all the schools with less manpower." Id. at 28. Plaintiff argues that "a

question of fact is raised as to whether the apparent lack of resources and lack of a

comprehensive plan for handling dismissals somehow contributed to this occurrence." Pl. Mem.

of Law 23. Yet plaintiff does not point to any evidence in the record to connect the Safe Corridor

Program to the alleged violations of plaintiff's constitutional rights. Plaintiff argues that

Wernersbach improperly stopped plaintiff and Fergoug because he was "in haste to keep the

large volume of people moving," and that Ortiz falsely believed it was necessary to use force on

plaintiff because of a "communication breakdown" between the officers that was a "foreseeable

consequence of the situation that these officers were forced to operate in." Id. These arguments

are merely speculative, and the plaintiff cites no evidence to demonstrate how the reduction in

staffing for the Safe Corridor Program influenced the officers' actions. For example, plaintiff has

failed to point to any statistics regarding the reduction in staffing, any concrete information about

how the reduction in staffing affected NYPD operations in this particular location, or any other

instances where a lack of resources for the Safe Corridor Program contributed to violations of

individuals' constitutional rights. Furthermore, plaintiff makes no claim and provides no evidence that supervisors in the Safe Corridor Program were aware of the actions of Wernersbach and Ortiz, let alone that they condoned their actions. See King v. City of N.Y., No. 12-CV-2344 (NGG)(RER), 2013 WL 2285197 (E.D.N.Y. May 23, 2013), at *10 ("Aside from vague accusations . . . the Complaint does not in any way put forth facts that supervisors were aware of and approved of the Defendants' conduct.").

A Monell claim cannot go forward on conclusory allegations regarding a single incident without more evidence that connects this incident to a municipal policy or practice. See Howell, 2013 WL 3013663 at *2 ("Plaintiff's conclusory allegations provide no basis for allowing the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (internal quotation marks and alteration omitted); Martin v. City of N.Y., No. 11-cv-02862 (ENV), 2012 WL 4569757 (E.D.N.Y. Sept. 29, 2012), at *3 ("[T]here are no plausible allegations that this unique conduct about which plaintiffs complain has ever been replicated anywhere else."); Hewitt v. City of N.Y., No. 09 CV 214(RJD)(MDG), 2012 WL 4503277 (E.D.N.Y. Sept. 28, 2012) ("Plaintiff has set forth no proof—instead relying on conclusory allegations—to raise a genuine issue of such an existing, unconstitutional municipal policy.") (internal quotation marks omitted). Accordingly, plaintiff's claims against the City of New York cannot survive summary judgment.

**III. CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's municipal liability claims are dismissed. Defendants City of New York and Police Department of the City of New York are dismissed from the action. Plaintiff's § 1983 claims for false arrest and excessive force are permitted to go forward.

SO ORDERED.

_/s/_____
Allyne R. Ross
United States District Judge

Dated:          October 24, 2013
                Brooklyn, New York

22